We'll hear argument first this morning in Case 17-290, Merck Sharp & Dohme v. Albrecht. Mr. Dvorafsky. Mr. Chief Justice, and may it please the Court, Respondent's express theory is that the FDA, fully informed of the risk of atypical femoral fractures, ignored that risk and its own statutory and regulatory responsibilities because it didn't like the way Merck phrased its proposed warning. That cannot be right. If a manufacturer, as Merck did here, informs the FDA of a possible risk and unsuccessfully asks to revise its label in light of that risk, then failure to warn claims based on that risk are preempted as a matter of law. That rule follows from the statutory and regulatory framework governing the FDA's conduct and from the presumption of regularity. The presumption of regularity, of course, assumes that federal agencies do their jobs correctly. The FDA's job in this case includes protecting the public health by working with manufacturers to revise drug labels when necessary. Mr. Dvorafsky, let me give you a hypothetical because I think we could all agree that if you had proposed a warning, let me just say major fractures versus stress fractures, and if you had proposed a warning that dealt with major fractures and the FDA had said no, we don't think that the literature supports that, then there's nothing you can do and you should be immune from any suit. I think that that's pretty clear. The question is sort of, you know, did you propose a different kind of warning? So let me give you a hypothetical. Suppose that you manufacture a drug and there's some evidence, whether it's enough, hard to know, but there's some evidence that it causes ovarian cancer. And you, the drug manufacturer, proposes a warning to the FDA, but instead of saying that the drug causes ovarian cancer, you say it causes ovarian cysts. Now, ovarian cysts are nothing that anybody wants to have, but they're an inconvenience. They're not ovarian cancer. And the FDA says, no, we don't think that that's the issue at all. Does that mean that you're off the hook now with respect to revising your label to say that your product causes ovarian cancer? I don't think that you're necessarily off the hook in that situation because you haven't warned about the relevant risk. But in our case, there's no question that Merck did warn about the relevant risk. The United States has told us that that is how the FDA understood the warning. The Third Circuit acknowledged that Merck proposed to warn about atypical femoral fractures, and you have to look at the context in which this warning came about. Okay. So that makes it a much smaller case, right, that we can agree on things on either side. We can agree that if the FDA said to you, you don't have to warn about major fractures, you are off the hook. And on the other hand, we can agree if the FDA rejected a warning that had nothing to do with the thing that was really at risk, you're not off the hook. And then the whole question boils down to, what was your proposal? What was their response? Were you both talking about the same things? In other words, were you both talking about major risks? Or did the FDA look at your proposal and say, they're not talking about major fractures, they're only talking about stress fractures, and there's no reason to think that stress fractures are a real risk, and no reason to put that in the label? I don't think that's quite right, Justice Kagan, because you have to look not only at the warning that was proposed, but also at the information that was in front of the FDA about the risk. And this is where, again, the FDA's complete response letter has to be understood in light of the FDA's statutory obligations. Under 35504, the secretary is obligated, if it believes that something should be included in the label of the warning, it shall promptly have a back and forth with the manufacturer. Yeah, but you see, that's the reason I asked that question about the ovarian cancer and the ovarian cysts, because I think you could say on something like that, well, look, it's true that our proposal talked about ovarian cysts, but we gave them all of this data. And if they had really looked at all of the data, they would have seen that there's a real risk of causing ovarian cancer. And the fact that they didn't tell us immediately to change our label means that we're exempt from suit. And I would think that that is not a good understanding of the statute. The idea that they have to look through all of your data, even though you pinpoint an entirely different risk, in order to find out what the real risk is. And that if they don't manage to do that, you're exempt from suit, that seems to me a very counterintuitive reading of the statute. And indeed, not just counterintuitive, it seems to conflict with the statutory provision, the rule of construction, that says that manufacturers have primary responsibility over their labels. And for that reason, I think that would be a different and more difficult case than the one that we have here. But here, the complete response letter has to be understood, both in light of what it says, but also against the backdrop of the FDA's regulatory duties and the back and forth the FDA. One, please point me to where in the complete response letter you say that they thought stress fractures were the same as the atypical fractures. As I'm reading the response letter, and this is what they said to you, your justification for the proposed precaution section language is inadequate identification of quote stress fractures. May not be clearly related to the atypical, forget that word, fractures that have been reported in the literature. Discussion of the risk factors for stress fractures is not warranted and is not adequately supported by the available literature. Nowhere did they say that the atypical fractures are not supported by the literature. And nowhere did they say, don't change it. The rest of the letter tells you, make changes and we'll come back and talk more about this. I look at their argument that the conversation that your person had with them was saying to them, we're thinking about this. Now come back with something else and maybe we'll give you what you want, maybe we won't. But I don't think from the complete response letter, if you're a textualist, that you can look at it and say that they were saying no to an atypical fracture warning. They were certainly saying no to a stress warning. So read me something in the complete response letter from that letter standing alone that you could draw your conclusion. So let me make two points, Justice Sotomayor. First, the complete response letter is not a statute that can be read in the same way as a textualist would read a statute. It has to be understood against the backdrop of the statutory and regulatory background. But if we're going to focus just on the response letter- But statutory backgrounds basically says the only way that you advise someone to change a label, as I understand it, is if it's minor changes. This would be a major change. And so by regulatory standards, they would have been acting improperly if they had approved your language with telling you make some cosmetic changes, because they didn't think this was cosmetic. I respectfully disagree, and I think the United States disagrees that that's how the FDA- Doesn't mean they're right. I read the statute. I don't read them. But looking at the statute under 355.04a, the Secretary has a statutory obligation, if it believes a warning is warranted, to work with the manufacturer. And if it disagrees with the proposed changes by the manufacturer, it's obligated by the statute, it shall initiate discussions to reach agreement. So it can't just say no to a warning if it disagrees with the phrasing of it. And in fact- But where is the, in the back and forth, do you have references to atypical stress or atypical fractures? So the term atypical ephemeral fracture is what we're calling today the risk that Respondents are concerned with. That term did not even really begin to be settled upon until a task force report that came out later. But what is clear, both in the back and forth and on the face of the complete response letter, is that Merck proposed to warn in both the warning and precaution section and the adverse reaction section about low energy fractures at the subtrochanteric region of the ephemeral shaft. That's at Joint Appendix 511. So the letter begins by noting that that is what Merck proposed to warn about in both sections of the label. So we know that's what the FDA is thinking about. We also know from the FDA's treatment of the adverse reaction section of this, of the proposed warning, that when it wants to revise a justified warning, it does so. So for the adverse reactions warning, the FDA proposed edits, but for the warnings and precautions section, it didn't. We know the same thing from the FDA's October 2010 interaction with Merck. At that point, after the task force had completed this study, and when the FDA carried out its obligations under 355.04 by initiating a process with Merck, Merck again proposed some language that included stress fractures, and the FDA redlined it. So that's what the FDA does when it thinks a warning is justified, but it disagrees with the manufacturer's proposed language.  MR. BROWNLEE I think the question that we're all kind of struggling with here seems to me to be this, or something along these lines. Reading the statute your way, do we create a moral hazard that encourages manufacturers to supply the FDA with a lot of information, overwhelm it with data, but maybe not the most artfully drafted, and maybe deliberately inartfully drafted warning that it thinks is reasonably calculated to be refused, so that it can avoid having to shoulder or bear its own costs of – internalize its own costs of negligence? What comfort can you give the Court that that's not the outcome of the statutory regime reading that you're proposing? MR. CLEMENT One comfort that I would give the Court is that the FDA itself, which is – would be in the position of having the problem that you're describing, doesn't seem concerned about that problem. But the other comfort that I would give you is that we don't dispute that under the statute, both parties, both the FDA and the manufacturer, have certain responsibilities. We're not trying to absolve the manufacturer of its responsibilities. But when you have before you an impossibility preemption case where the FDA rejected a proposed warning, the only way to understand the meaning of that rejection and what it means for impossibility is in light of the FDA's part of its obligations. The FDA does have some obligations, and where it is provided with a warning that it understood to be about the relevant risk and rejects that, that necessarily establishes that it was impossible for the manufacturer to simultaneously comply with both what – KAGAN The way you answered that question, you said a warning that it understood to be about the relevant risk. And that's really the question. The back and forth about the proposal and about the FDA's reaction to it is whether the FDA understood to be – the warning to be about major fractures, given that your proposal talked, I think, in six different sentences about stress fractures. So let me address the stress fracture language, because I think that may be causing some of the confusion here. The risk that Merck warned about was about these atypical – I'm sorry, about low-energy fractures at the subtrochanteric region. At Joint Appendix 746, Merck explained to the FDA how it was using the term stress fractures. And it explained to the FDA that the term stress fractures included the very same kinds of things that respondents are concerned about, including insufficiency fractures and complete fractures. Those are all kinds of low-energy fractures, which is how Merck was using this  And moreover, the reason – MS. GOTTLIEB But if I understand that – if I understand this sort of terminology and maybe I don't, but insufficiency fractures are – you know, essentially there's a world of things where you can have a traumatic incident that leads to a fracture, and then you can have other fractures that are not caused by trauma, right? But the fractures that are not caused by trauma can be small fractures, stress fractures that take care of themselves with rest and elevation, and large fractures where all of a sudden you're staring at a bone that's popping out the wrong way. So those are really different things. They're both caused by something that's not trauma, but one is an inconvenience and the other is a serious injury. MR. CLEMENT The serious injury, the complete fracture, is something that begins as what looks like a stress fracture and can progress to completion. And so what Merck was trying to do in this warning was to explain, if somebody comes in complaining of the kind of pain that might be consistent with a stress fracture, doctors ought to figure out what's causing that. And if you rule out the typical causes of stress fractures – exercise, steroids, alcohol use, things like that – if you rule those out and they don't explain the symptoms that the doctor is seeing, then maybe consider stopping bisphosphonate use, because perhaps there's a connection between bisphosphonate use and what will eventually progress to the completed fracture. MR. BOUTROUS If we read the letters to refer to stress fractures as something – and not atypical fractures, could you still win this case? MR. CLEMENT We could, because regardless of how you read the letters, the FDA has told us in this court and all of the FDA's actions in connection with this area show that it understood what we were talking about. And the one additional piece of evidence that I would point to that I haven't identified to this point, in March 2010, months after the FDA issued its complete response letter, it made a public safety announcement saying that it was continuing to study this issue of atypical femoral fractures. It still was not convinced that the data supported a warning and that doctors should continue to prescribe in accordance with the existing label. That shows, again, that the FDA was on top of this problem, it was studying it, and it had not yet, even months later, reached a belief that a warning was justified. Given that, it was impossible for Merck to provide one in accordance with the purported requirements of state law. MR. BOUTROUS What do we do about the fact that under the regulations, Merck could have filed a CBE at any time? Does that pose a problem for you, at least after, say, the March investigation starts? MR. BOUTROUS The standards for evaluating a CBE are the same as the standards for evaluating a PAS. It's essentially the difference between asking forgiveness and asking permission. Because we know that the FDA rejected the PAS, we also know that a CBE would not have been authorized either, and, again, that's what establishes impossibility. MR. BOUTROUS I'll spot you that with respect to, for purposes of this question, before the March 2010 letter, but what about after that? Once it starts launching an investigation into the product, the task force period, what do we do about that period? MR. CLEMENT I think the point, though, is that in March 2010, what the FDA said is that it was waiting on the task force report. Nothing had yet changed. It just said that it was studying the information. When the task force report came out, that's when the FDA acted and said, now we believe that a warning is justified, and it initiated its 355.04 process. If that's what the – if the FDA had thought that a warning were justified earlier, that's what it would have done. It would not have issued this complete response letter. If I may reserve the remainder of my time. MR. ROBERTS Thank you, counsel. MR. STEWART Mr. Chief Justice, and may it please the Court, I'd like to begin by addressing an issue that both Justice Kagan and Justice Gorsuch have touched on. And I think it's important to distinguish between two potential types of confusion. The first is that in October of 2010, when the FDA ultimately decided that in addition to the warnings and precautions section of these labels was warranted, it rejected Merck's proposal that the warning include repeated uses of the term stress fracture. And FDA did express at that time the concern that practitioners for whom that term usually connoted a relatively minor event might read it as understating the seriousness of the potential health risk of FOSAMAX. That potential type of confusion needs to be distinguished from the question, was FDA confused by Merck's submission as a whole? And there's no reason to think that that was so. At page 670 of the joint appendix, Merck, kind of in the introductory section of its proposal, summarizes what it's the warning that it's proposing to add. And it says at the very top of the page, Merck is proposing to add language to both the precaution and adverse reaction post-marketing experience section of the label to describe low energy fractures that have been reported, of which some have been stress insufficiency at the subtrochanteric region of the femoral shaft. MR. GILLESPIEGEL. Thank you. At page 670 of the joint appendix. And so Merck was making clear that the language it was proposing to add both to the warnings and precautions section and the adverse reaction section proposed to address the same risk. And indeed, the language that it proposed to add to the adverse reaction section included a cross-reference to the proposed warnings and precautions section, again, reinforcing this. The second thing I'd like to point out in that regard is what my colleague was referring to as Merck's own explanation for its use of the term stress fracture. Merck explained at page 746 of the joint appendix in its proposal that it was using the term as an umbrella term to refer to fractures that could be partial or complete. The distinguishing event was that they occur without external trauma. And so it's not a matter of something being a serious fracture or a stress fracture. The term stress fracture encompasses both serious and relatively minor fractures. Again, FDA's concern ultimately was that practitioners who were used to seeing the term in connection with minor events might misconstrue it. But FDA understood it to refer more generally to any fracture that was caused without external trauma. MS. GINSBURG. How are we to understand, Mr. Stewart, like what FDA understands at any given moment? In other words, what are we to look to when we decide whether it's impossible for Merck to change its label? Because one easy way of thinking about whether it's impossible for Merck to change its label is to say, did the FDA tell Merck that it couldn't change its label in the relevant way? If the FDA told Merck that, then it's impossible. But if the FDA didn't tell Merck that, whatever is in the FDA's head, if the FDA didn't tell Merck that, then it's not impossible for Merck to change its label. And it has responsibility over its label. And to the extent that it thinks that the literature supports a change, it should change its label. MR. STEWART. Well, let me say two or three things about that. The first is, you look first and foremost to the letter itself. And it would obviously have been better if the letter had stated, without ambiguity, the reason we are rejecting your proposed addition to the warnings and precautions section is that we don't think there is sufficient evidence of causation to warrant inclusion of this health risk in this particular portion of the label. That would have been better. Given that the letter that MS. STEWART. Right. That would have been better, and it would have been enough.  We wanted to be here. MR. STEWART. Exactly.  STEWART. Or maybe we would, but it would be an easy case. Merck would win. MR. STEWART. Right. But failing that, failing an unambiguous letter, the Court should construe the letter in light of Merck's submission, in light of the surrounding statutory and regulatory scheme, and in light of FDA's subsequent actions. MS. STEWART. Why? Why? Merck is a manufacturer of a drug. It has a tort duty to ensure that its drugs are either safe or that adequate warnings are given when it's not. The Act does not take away that responsibility. It does say that you have to get approval from the FDA. But if there's any ambiguity, given that we're already creating something that doesn't exist in possibility preemption, why shouldn't we take it at its face? MR.  Well, of course. MS. STEWART. Until the FDA says no, if you're a manufacturer who understands there's a serious risk to a drug, shouldn't you continue to try everything possible, including making the corrections that you were told to make, including doing what the task force did, telling the FDA you're wrong? Instead, what Merck did was say, I'm absolved. I don't have to make the changes. I don't have to talk to them anymore. I just have to let them, them being the FDA, figure out what to do. Seems to be sort of turning responsibility on its head. MR. GOTTLIEB. Well, as you say, an important feature of the statutory and regulatory scheme is that while the manufacturer has responsibility for its label, it can make changes only with FDA's approval. MS. STEWART. Not true. It could go the other route and make the change itself and wait for the FDA to tell it it's wrong. MR. GOTTLIEB. The reason that FDA sometimes disapproves proposed additions to warnings and precautions or to other aspects of the label is not simply that it regards the warnings as unnecessary. FDA has expressed a concern about the potential ill effects of overwarning. That is, if a label contains information about every possible health risk or every bad thing that has ever happened to a person who used the drug, people may be deterred from using a drug that would actually be useful. The really important warnings tend to get drowned out.  STEWART. So what happens here to the incentive for manufacturers to continue working expeditiously with the FDA to effect changes when they're necessary? MR. GOTTLIEB. Well, our point is that if the better reading of the letter, if the better understanding  evidence wasn't there, then for any preemption regime that would create an incentive for Merck, nevertheless, to add the warning through the CBE process and wait for FDA to disapprove it, would, in our view, be counterproductive. It would create the incentive for the type of overwarning that FDA would like to discourage. MR. GOTTLIEB. So what would happen if the FDA had said in the complete response letter, the medical evidence is insufficient, and then Merck turned around within a short period of time and filed a CBE relating to the same thing? What would the FDA have done? MR. GOTTLIEB. I think it would surely have disapproved it, and it would have been inappropriate for Merck to proceed in that way, because the CBE process is supposed to be invoked only when there is new evidence that the FDA hasn't previously considered. And if the FDA had said in response to the PAS application, we don't think the medical evidence is there, then unless some substantial body of new medical evidence had emerged during the interim, it would have been inappropriate for Merck to use the CBE route and it would be inevitable that FDA would disapprove it. MS. KAYE. I think, Mr. Stewart, you're saying two things. There are sort of two points on the spectrum that you're pretty clear about. One is, if FDA had told them, we just don't think we understand that this proposal is about major risks and we don't think that there's enough evidence in the literature to support that, that's easy. Merck doesn't change its label, and there can't be a suit against Merck. On the other hand, suppose that the FDA, and I understood this to be your point, suppose that the FDA had said, you know, the real problem with your label is that you're talking about stress fractures, and we think that the issue is these major fractures, and that's why we're rejecting it, and we're going to continue to be considering the possibility of major fractures. If the FDA had said that clearly, Merck is not off the hook. Would you agree with that? MR. STEWART. I would agree with that with this caveat, that you would expect the letter, given that the documentation in Merck's submission included a lot of information about the more serious type of fracture, even if FDA was concerned about the wording of the label, you would expect it to express a view one way or the other as to whether there was sufficient evidence of positive. MS. KAYE. Well, it doesn't know yet, let's assume. So this is something that it just doesn't know yet, and it's rejecting the letter for another reason. Now, you might expect that FDA would continue to work with Merck about the major fractures. You might expect a lot of things. But the only thing that the FDA has told Merck is, we don't like this label that you've done about stress fractures because we really think stress fractures are not a problem. MR. STEWART. But it seems very unlikely and really inconsistent with the statutory and regulatory scheme to suppose that FDA would do that, that it would receive a submission about the risks of these more serious fractures and yet would make no determination, even in its own mind, as to whether that risk was sufficiently severe, whether the evidence of causation was sufficient to warrant an addition to the warning. MS. KAYE. I would assume a hypothetical on both sides, right, where the language was sufficiently clear of what FDA was doing, that it either would or wouldn't take Merck off the hook. My real question for you is, suppose we're not at either one of those worlds. Suppose we have an ambiguous letter. Who should decide how to construe it? MR. STEWART. I think the court ultimately should construe it, but should construe it in light of the to initiate the process for changing the label if it had determined that the evidence of causation was sufficient to support an addition of some warning to the warnings and precautions section. MR. STEWART. Thank you, counsel. Mr. Frederick. MR. FREDERICK. Thank you, Mr. Chief Justice, and may it please the Court. Our position is that brand-name drug makers are responsible at all times for keeping their labels up to date. If the FDA rejects an inadequate warning or is uncertain about whether and how to mandate a proper warning, those Federal decisions do not make it impossible for Merck to comply with State law duties to market safe drugs. I'd like to start, if I could, with section 355.04i, which is set forth in the addendum to the red brief on page 8. That provision explains why it is not impossible for Merck to provide an adequate warning of atypical femoral fractures prior to 2010 when the FDA mandated a label change. It's the manufacturer's responsibility to maintain its label. So Mr. Chief Justice, in answer to your question about the back and forth, all that demonstrates is that, at best, FDA was uncertain about exactly what Merck was proposing, but this statutory provision, which is barely discussed at all on the other side's written presentations in this case, makes it clear that even when FDA got the power in 2007 for the first time in 60 years to mandate a proper warning, the manufacturer nonetheless is always responsible for keeping its label up to date. Alito, is it your argument now that Merck became liable at some point after the issuance of the complete response letter or on the day after the issuance of the complete response letter? Our position, Your Honor, is that the complete response letter, in a sense, doesn't affect the underlying duties at all because the warning that was proposed was an inadequate warning. But what if the FDA had said, the wording of your warning is bad because this term of stress factor is misleading, but beyond that, the data does not support any warning relating to low-energy femoral fractures? I think it's important to keep in mind what the regulatory duty of the agency is. The answer to that is that it that likely points stronger in the direction of preemption. But please look at section 314.110A1 of the regulations, because that regulation tells the FDA in its complete response letter, you have to give a full answer, a full justification, because that's part of the back-and-forth, the give-and-take with the manufacturer. And so, Justice Gorsuch, to your question about the moral hazard, it's not just if the FDA misleads the FDA by putting in, it's also if the company is negligent and doesn't fully understand itself. I would ask you to look at the amicus brief by Dr. Lane in this case. Dr. Lane was a consultant for Merck in 2008, prior to Merck submitting its PAS. What Dr. Lane says is that surely by that time, Merck would have had enough information to have prepared an adequate warning about these atypical fungal fractures. Mr. Frederick, let's say I buy at least part of what you're selling for purposes of this question, that the complete response letter and what is it, 35504, doesn't thank you, doesn't completely answer our question. We have, though, the March 2010 safety statement from the FDA, which pretty clearly says that they do not think that there is science enough to support a causal link between the drug and atypical femoral fractures. So whatever was missing in the complete response letter from the FDA seems to come in March of 2010. Why shouldn't we read the complete response letter in light of the March 2010 safety statement? Again, we're getting into the agency musings of the type that Justice Thomas very eloquently wrote about in Wyeth v. Levine, which is it is not impossible for the manufacturer to have done the right thing. What Dr. Lane says is — You and I will not dispute the elegance of Justice Thomas' opinion in Wyeth. But I'm not sure that helps me very much. And in all seriousness, if there's some ambiguity about the warning letter, about the complete response letter, isn't that resolved by the FDA's own statement, against interest perhaps, months later? Why doesn't that tell us exactly what it was up to? Because the standard is lower. And if you look at that press release in March of 2010, when the FDA uses the phrase causal connection, that's not what the regulatory standard is. We set out the regulatory standard on page 6 of our brief. And that is a much lower one. When it's for the precaution letter, it's to provide reasonable evidence of a causal relationship or causal association. Reasonable evidence is something that Dr. Lane knew in 2008 and was urging Merck to provide a better explanation. And that's why on page 17 of Dr. Lane's amicus brief here, he says what FDA needed was, quote, a medically accurate education. Well, and that's why it set up the task force at the same time to go study the issue. And it said up to that point, we don't have enough, but we're going to go study it. And so why isn't that tell us everything we need to know about what its complete response letter was about? As a matter of law. Justice Gorsuch, that's the whole point of impossibility preemption. Are we going to let Dr. Monroe, who is five layers down from the only presidentially appointed person at the FDA, write a letter that displaces huge swaths of State law? Now, what the S.G. is arguing here is that we should interpret the better reading of this, the back and forth, the full record should inform the meaning of this letter. But impossibility preemption, as Wyeth Versa-Levine held, is a, quote, demanding defense. And it's not really. I mean, are you really serious about that argument, that what would be preemptive is not the letter. What would be preemptive is what FDA would do. And that's the question. The only argument relating to the safety announcement is that it informs, it helps to tell us what FDA meant when it said, no, you cannot add a warning to this label. Justice Alito, we know the answer when Merck proposes an inadequate warning, that was rejected. We don't know the answer to the question that Wyeth Versa-Levine poses, which is what would have happened had Merck proposed an adequate warning? Well, I don't believe it. I think that was Justice Gorsuch's point. And the reason why we don't, and again, I'm going to go back to Dr. Lane, we have nothing in this about the duration of a case. Well, what page, by the way, if you happen to have it in your head, what page is it, not that, but the response letter? The response letter is at page 511 of the joint appendix. Well done. 511 to 512. Thank you very much. Okay. The other question, technical, is, is a, what is it called, the atypical femur fracture, is that a subset of stress factors? What Dr. Lane explains is that an atypical femoral fracture may have an origination as a stress fracture, but it sort of goes off in a completely different direction. Yeah, that's right. But okay, so somebody in stress factor, they use that word, they might mean atypical femur fracture, plus others. It's too broad, in other words. It's too broad. Okay. Got that. That's helpful. Now. But it's also too narrow. A stress factor, I thought, from what you've just said, that those words used in Merck's application are too broad, because it is a subset of those. Now, which is it? It's inaccurate. It's too broad and too narrow. That's the problem. That's very, very diplomatic. But this is my actual, where I'm leading. Look, I'm leading to this, that when you talk about the standard, drugs are important to people. They cure millions, or thousands anyway, of people who need to be cured or helped. Now, when you put on, and at the same time there will be a smaller subset that can be cured. So our solution to that is labels. Now, when you say displacing state law or something, you're talking like a lawyer, which is what you're supposed to do. But what worries me is if you go too far in allowing the tort jury to find mislabeling by not including things, you are hurting the vast majority of women here, or whatever, who can benefit from this medicine. On the other hand, if you don't go far enough, you will hurt that minority. Now, that's the general framework in which I'm trying to figure out the answer to the question. And that's why Justice Gorsuch's question was quite relevant. All the earmarks here are that Merck took this as a letter saying, we're not certain enough this is really going to hurt people, and we don't want you to put it on. Now, obviously, somebody must have picked up a phone when they got that letter, and they must have phoned somebody in FBA and say, do you really mean that? What do you mean? Because I can change those words' stress factor in two seconds. Or do you mean you don't know enough about it? Now, the appointment of the later task force suggests that they felt they didn't know enough about it. And therefore, Merck couldn't have done it. Now, I'm looking for your answer. I put out a pretty abstract and somewhat specific but more abstract question. I would like you to react. Let's not look at what the lawyers knew. Let's look at what the scientists knew. Merck scientists, and this is on page 515 of the joint appendix, they knew exactly what the FDA was rejecting. They said in their internal back and forth, the FDA doesn't like our stress fracture wording. Okay? Those scientists had been interacting with Dr. Lane, who a year earlier had said, these are a special type of fracture which don't exist in the general population. Ninety-plus percent of all people who get an atypical femoral fracture are on a bisphosphonate. I understood these. Mr. Stewart, to say it is a particular type of fracture, it's a particular type of fracture, but the FDA understood the use of that term to be broad enough to include the atypical fractures as well. That's not accurate. That's not what he said? I don't know if that's what he said, but we would dispute whether that's correct. And the reason is because if you look at Dr. Burr's expert report, which is in the joint appendix, and if you look at Dr. Lane's amicus brief, they say this is a very specialized form of fracture that generally doesn't occur in the general population. You agree that the question is what the FDA understood, right? I think that that question comes second, respectfully, Mr. Chief Justice. The first question is what did the manufacturer know or should have known at a particular point in time? And then the next question is what did the FDA understand about that? Because if you take the statute that I started my argument with, it's always on the manufacturer to stay up to date. Remember, the manufacturer has superior information about these drugs to the FDA. The budget of the FDA's drug safety division was less than the annual sales of this very drug. And so you're talking about a massive resource disparity between what the agency has and what the drug company has. Well, what we're talking about is what they told the FDA, what the FDA understood. And if when they told the FDA about, and we had the different citations to the joint appendix from your friend on the other side about the notion that stress fracture included the things, the atypical fractures, and if that's what Merck understood, they gave to the FDA what they had. And if that's what the FDA understood, that's how we should interpret the FDA's response. And, Mr. Chief Justice, as a matter of preemption law where we are invoking the Constitution to say that Federal law is going to displace State law, we shouldn't be engaging in some musings or some interpretation about a low-level civil servant at the FDA and what that means. Not low-level civil servant. I don't understand your response. I understand the supremacy clause in State law. But the question is, what was being communicated to the FDA? So how is it, how should they have read and how did the FDA understand their own response? And we know the answer to that because we're hearing about it from the government's counsel today. So I'll read to you from page 515 of the joint appendix. This is the Merck scientists who have just received the complete response letter. They say, quote, however, FDA, it, believed that our justification to support the proposed precaution text was inadequate. It believes that stress fractures may not be clearly related to atypical subtrochanteric fractures. So the scientists are interpreting the complete response letter to say, the stress fracture language that we offered is inadequate. The FDA has rejected that language. And the reason why the wording matters is because, as we've pointed out in our brief, and I think it's at page 41, footnote 20, page 40, footnote 21, there's a lot of back and forth between drug companies and the FDA over the wording. Why? Because the FDA understands that the wording has to properly educate doctors about the risks associated with these drugs. And if the doctors can't understand the gravity of a warning where one of their patients may be walking down the street and have her femur snap, that's what we're trying to get at, the proper wording of these labels. And that's why Congress made the decision to keep the manufacturer at all times. Alito, what Mr. Stewart cited was page 746 of the Joint Appendix, where Merck defines a stress fracture in this way. A stress fracture, also known as an insufficiency fracture, is defined as a partial or complete fracture occurring with either normal or increased activity, but without an identifiable external traumatic event. Now, does not that encompass the type of fracture that you're talking about? Not really. Well, it says or complete. It does, Justice Alito. But the question is, if you are an FDA scientist who has been looking at the studies, are you going to let Merck redefine what a stress fracture is? Dr. Lane, in his amicus brief, says, no, no, no. That's not what a stress fracture is. That is an inaccurate, a medically inaccurate definition. Yeah, well, that's fine. But this is what, you know, in very simple terms, this is what troubles me about your argument. This is not a situation, I think, where Merck is proposing to warn about one thing, and the data shows that there's a danger about something that's totally unrelated. And therefore, the FDA may not focus on this second thing, like Justice Kagan's example of perhaps of ovarian cancer and ovarian cysts. But if the FDA sees this proposed warning, and they think the wording here is bad, they shouldn't be talking about stress fractures. But we look at the data, and we see that there is something that should be labeled differently, and there should be a warning about that. It would shock me if what the FDA should do in that situation is to say, well, you know, you got the warning wrong, and so we're not going to issue it, and we're going to prohibit that, but we're not going to do anything more. If they understood that there was a danger of something else that is at least related to what the manufacturer was proposing to warn about, surely the public would expect them to do something. That's what troubles me about your argument. Well, Justice Alito, if you look further into the record of what happened here, there's an April 2009 e-mail chain between the FDA and Merck, in which FDA says it wants to, quote, work with Merck on precautions language, if it is warranted. It's still trying to understand, because these are a specialized, highly unique set of injuries here. So suppose, Mr. Frederick, the best reading of what happened here is that the FDA looks at this letter, and it says this proposal, and it says this is a terrible proposal. Whatever the problem is, the problem is not stress fractures, and so we're going to reject that. But we do think that there is an issue, and we don't know the answer to it yet. We do think that there's an issue about these more major fractures, and you see this because eventually they do a task force, and then the task force decides something. So if the FDA is in that boat, right, where it sends the letter, and the letter says what you've said is just inadequate and wrong, but we don't know yet what we're really dealing with, and we don't know whether a change in your hypothesis is going to be enough to study that, what should the manufacturer do at that time? The manufacturer should continue to study the problem, should continue to provide information to the FDA. Should the manufacturer change the label? Possibly. It depends, Justice Kagan, on what the manufacturer knows and its understanding of the science. Here, let's take, Justice Alito, if we could follow your hypothetical a little bit further. Suppose FDA had approved this label, okay? All this language about stress fractures, that's now in the label. Our claim, it can't be preempted then, right? True. But what's bothering me about the approach that you're taking is that in this particular area, in this particular area of medicines, I don't really see how we're going to benefit by 50 different states really giving different signals to the manufacturers. And I can see a lot of ways in which, from a health point of view, we're going to lose. That doesn't mean the law is wrong. It doesn't mean, you know, it's just a question of emphasis. And here we have an emphasis, the next page in the one you cited. The FDA says in 2010, FDA's review of the data did not show an increase in this risk, the relevant risk, in women using these medications. So there are indications in this record. Right. That they thought that it is more dangerous to put the label, to put the risk in the label than it is to leave it out. And then they set up a task force, decided they were wrong. And here's, this is a really interesting thing about the task force. The FDA clearly didn't have all of the relevant information. Because what the task force finds is that there are about 170 some articles that have been written on this subject. Only five had been given to the FDA. Or that there was evidence that the FDA was aware of. And so that's why the statute imposes the duty on the manufacturer. Because the manufacturer is going to be tracking this all over the world. There was a report from a Merck employee in Singapore in 2006 who said, I've now seen several of these specialized atypical femoral fractures. I think this could be an indication that we need a safety signal. And, Justice Breyer, I accept your basic point. But what started this whole thing was the first lawsuit against Merck for these atypical femoral fractures was in March of 2008. And that's what started this whole back and forth. The FDA became aware of this lawsuit and started to track what's really going on here. What if you had a situation where, in light of the exchanges you've talked about, Merck goes ahead and puts on its label, oh, by the way, you should be very careful about these atypical femoral fractures. And it turns out that doctors say, well, gosh, if that's going to happen, I'm not going to prescribe Fozomax. And as a result, that drug, which is important for many women, is no longer being prescribed. Now, can somebody who thinks they should not have put that warning in be able to sue because they gave too many warnings and that prevented doctors from prescribing a drug that they otherwise should have been prescribing? So, Mr. Chief Justice, the answer is that the manufacturer is always responsible for its label, but the overwarning problem is one where the FDA is balancing these risks and benefits at all times. And here we know that wasn't a problem. Well, no, I know you're changing hypothetical. Your point, well, maybe I don't know. I gather your answer is that the manufacturer has the responsibility. So if the manufacturer knows this, it should put in this warning. And if it turns out that that was overwarning, then they can be sued for that. Well, there has to be an injury that comes from the overwarning. The injury is that doctors are not prescribing Fozomax to women who would benefit from it, and they're not prescribing it because Merck put in a warning that the FDA would determine was overwarning. Not, Mr. Chief Justice, respectfully, there's not a State law tort there. There has to be an injury because of the overwarning or else there's no suit. The injury is the physician decides not to prescribe Fozomax to a woman who would benefit from it. Right. But that's not a tort. So it's a tort. There's no State law there that says there's negligence in that circumstance, Your Honor. Well, I thought the logic would be the same as your logic here, is that the label turned out to be misleading because of the drug manufacturer's decision about what to include, which they should have included, even though it's not required by the FDA. I thought that would be the same cause of action. But my point here, Mr. Chief Justice, and let's go with a hypothetical that the FDA had actually accepted this. Our claim would be exactly the same, which is that this language about stress fractures doesn't tell the doctor, worry about the prodromal pain, worry about how long your client has been on bisphosphonate, worry about what the particular features of the X-ray look like when the patient complains about this. That wording was all in the 2010 label that FDA mandated. It wasn't in Merck's label in 2009. Mr. Frederick, let's be coming down to practical, okay? You say earlier that the Merck scientists were saying when they received this letter, the FDA doesn't like our language. What do you suggest Merck could have done without changing its label until the FDA would have approved it? And why do you believe that you can convince a jury that if they had done it your way, the FDA would have accepted the new label? Frederick, well, as a regulatory matter, let's start with the law first. The CBE regulation gives the manufacturer the right to change its label subject to rescission by the FDA. That never happened here because Merck never proposed an adequate warning. Sotomayor, do you know that the FDA, assuming the theory that the FDA doesn't believe the label is adequate, what could they have done absent the study? Meaning because the study obviously changed the FDA's mind. You're saying Merck could have done it. Frederick, yes. There was plenty of information by that point, Justice Sotomayor. And Dr. Lane goes through this. He goes through the chronology. It's a beautifully done amicus brief to explain what the scientists knew and when they knew it. And that wasn't communicated by Merck to the FDA. Is that what you're saying? Yes. What Dr. Lane says, and Dr. Lane is a Merck consultant, okay, in the summer of 2008. He's writing an amicus brief on our side of the case because he doesn't believe that Merck gave, quote, medically accurate education to the FDA about these fractures. He's the one who had coined the term Fosamax fracture because in all of his years of osteology, he had not encountered these kinds of fractures until he had patients coming to him who were on this drug. Mr. Frederick, do you want us to affirm the decision of the Third Circuit? You should affirm the judgment because the judgment was correct. Summary judgment for Merck was not warranted. And so then the issue should be decided. The juries in these cases should decide whether the FDA would have approved this. We take the position. Based on Merck would have to prove to a jury by clear and convincing evidence that the FDA would not have approved an appropriate warning. We agree with Merck that because of the complete response letter back and forth, we think that that, and we argued this, I argued this in the Third Circuit, was a legal document that a judge can interpret. We believe that based on a sound interpretation of the letter, it doesn't prove impossibility. Are you saying that you think that the question is, was there official action by the FDA that prevented Merck from changing its label? And the answer to the Is that the test? The test In your view, is there official action by the FDA that prevented Merck from changing its label? To make an adequate warning. That's important, Justice Kagan, because the warning that the FDA has to reject has to be adequate to address the risks of the State law. Correct. Okay. So that's what I was assuming. But that's the question. And that's a legal question. Is that correct? It is a legal question, but it has factual components. But a judge can decide that question. A judge can decide the core legal question, but in all constitutional questions there are usually fact issues, and we can sign those to juries to decide what the fact issue is. Not always. There are a lot of mixed issues where because they're predominantly legal, the judge does it. Patents, for example. Markham is a case of that. And Coors Confessions. I mean, there are a number. As I said to me that this is in that number because it's predominantly a legal question. And there could be factual disputes on the brute facts. But here I don't think there are, really. I think that the one disputed fact here that has sort of surfaced as a result of the argument today is what does the phrase low energy mean? The Merck and SG have taken the position that low energy encompasses atypical femoral fractures. Dr. Lane says actually that's not accurate. And so to the extent that there's a debate between experts over the meaning of particular scientific terms, judges, Justice Breyer can certainly decide that. But so can jurors. Breyer. But normally there's a factor. There are a set of factors classically when it's a mixed question of fact of law. And one of the factors is sometimes who will do it better, at least as I interpret it. And as I say, we brief the case in light of this Court's cases about constitutional issues. We don't see that there's something special about the preemption provision of the Supremacy Clause that would take it out of the normal fact-finding ambit of juries. But I would say that if you don't agree with me on that, you still have to affirm and instruct the Court below, in fact, this is going to be a legal question that judges are going to decide. That does not affect the outcome of the case here. Summary judgment for Merck was improper. Alito, I'm confused. You want us to say there is no preemption? Do you want us to say that Merck wasn't entitled to summary judgment on the issue of preemption? Which of the two? Merck was not entitled to summary judgment. Yeah. But do you want to alter the judgment of the Third Circuit by saying that it was wrong in saying this should be submitted to a jury, that it's a factual question to be submitted to a jury? As I say, I think there are fact questions here. But, Justice Alito, my brief argues that summary judgment for Merck was improper. Because of the extremely bizarre way this case came up on a motion, on an order to show cause, there weren't even cross motions for summary judgment, which occurs in 99.999 percent of all cases. So we're talking about how do you handle a wrong district court judgment with the best it could in very strange circumstances, and now the cases in this Court, you can affirm and you can say what you want to say about jury issues deciding. But here, our position is the complete response letter, as a matter of law, could not have made it impossible for Merck to update its label. Thank you, counsel. Oh, sorry. Thank you, counsel. Mr. Oreskes, you have three minutes remaining. Thank you, Mr. Chief Justice. If the FDA does not know yet whether a warning is justified or not, that means no. The manufacturer in that situation can't change the label. That's true whether it's we're talking about the CBE process or the PAS process. And that's the situation here. Mr. Frederick focuses on low energy and stress fracture and any debate about that is not possible. How about the manufacturer's duty to work with the FDA to ensure that the label is right and that it has all pertinent information to reconsider its initial decision? Mr. Frederick said there were only five of 170 articles provided to the FDA. Your own scientists said they're confused. Doesn't Merck have an obligation to show that if presented with the proper language and the proper evidence that the FDA would have, or don't you have to show, would have still denied the right label? Is that your burden? Justice Sotomayor, the process that you're describing is exactly what happened here. It didn't. You never gave them a proper language and you never gave them what your scientists told you to give them. Justice Sotomayor, the PAS submission included 132 studies about the risk that Respondents say we should have warned about. They're very same studies that Respondents themselves rely on that. All of that was before the FDA. The FDA isn't saying that it was in any way misled. And the back and forth process here, if you look at Joint Appendix 508, the e-mail that Mr. Frederick referred to, an FDA official told Merck to withdraw its request so that the FDA could close out this issue while it continued to study it and work with the FDA on, work with Merck on language later if it determined that a warning was warranted. In other words, at the time of the CRL, based on all of the information that the FDA had before it, and it doesn't claim that it was misled, no warning was justified at that time. In March of 2010, the public safety announcement, Joint Appendix 520, the FDA said, quote, the data did not show an increase in this risk in women using this medication, period. In light of that statement from the FDA, there is no way that Merck could have changed its warning because the FDA has told us that no warning was justified at that time. As for Dr. Lane, Merck's warning contains the two hallmarks that Dr. Lane says were necessary. The warning itself on its face refers to insufficiency fractures and complete fractures. It doesn't just refer to stress fractures. With respect to the stress fracture language, Dr. Lane himself in his amicus brief admitted that AFFs start as stress fractures. That's at page 9, footnote 11, and also at page 12. Mr. Chief Justice, if I may just wrap up, where we know from the FDA's actions and statements that no change was permissible because it's not scientifically justified, that establishes preemption as a matter of law. Thank you, counsel. The case is submitted.